J-S46018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ROBERT C. WATKINS AND SCOTT R. WATKINS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH RIAD | : | |
| | : | No. 3644 EDA 2018 |
| Appellant | : | |

Appeal from the Judgment Entered January 22, 2019
In the Court of Common Pleas of Chester County Civil Division at No(s):
2014-09170-RC

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 31, 2020**

Appellant, Joseph Riad, appeals from the judgment entered on January 22, 2019, granting a one-half interest in the subject residential farm property to Robert C. Watkins and a one-half interest to Appellant.  Upon review, we affirm.

The trial court summarized the facts and procedural history of this case as follows:

> At all relevant times, [Robert C. Watkins and his brother, Scott R. Watkins (hereinafter individually "Robert" or "Scott" and collectively, "Brothers")] have resided [at the residential property in dispute in] East Nottingham Township, Chester County, Pennsylvania (the "Property").  Brothers resided at the Property for more than thirty years and received title from their mother, Isla Watkins, on February 17, 1982.  In September 1997, Brothers encumbered the Property with a 30-year, $70,000[.00] mortgage.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Brothers and [Appellant] have known each other for more than twenty years. Prior to disagreements that led to this litigation, Scott and [Appellant] were close enough to consider one another family. Robert considered [Appellant] to be an acquaintance.

Brothers are unsophisticated, trusting men who would prefer to look the other way when confronted by trouble. Scott, 60 years old at [the time of] trial, is a self-employed mechanic, primarily, if not exclusively, working on motorcycles, and a part-time nurseryman. Robert, 66 years old at [the time of] trial, left employment in 1997 to care for his mother. Robert has a 1976 degree from Arizona State University and a degree from Del Tech Community College. Robert raced Standardbred horses and worked as a stage crew hand at the Hotel DuPont Theater.

[Appellant], 45 years old at [the time of] trial, is an educated and sophisticated businessman. [Appellant] moved to the United States from Kuwait when he was 14 years old and became a citizen in 1998. He matriculated at West Chester University at age 15 and graduated three years later with a degree in computer science and an accounting minor. [Appellant] has been a commodities trader at IMA World Trade and technical services director for an engineering firm, EPS. At the time of trial, [Appellant] had a farm and was engaged in the overseas exportation of cattle.

[At times, Brothers have experienced financial difficulties]. After leaving employment in 1997, Robert cared from his mother, who was debilitated with dementia and lived at the Property, until she passed away in September 2017. Robert also cares for his wife, Rebecca Beckenstrater ("Beckenstrater"), at the Property; she is debilitated from multiple sclerosis. Beckenstrater has lived at the Property since April 2010. At the time of trial, Beckenstrater was confined to a wheelchair and partially blind. Robert has modified the residence to accommodate the handicapped members of his family.

[Appellant] was aware of Brothers' financial difficulties and the burden[s they] endured caring for family members. In August 2010, [Appellant] approached Scott and began to work on him to convince him that he, [Appellant], could alleviate the family's financial burden. [Appellant] told Scott that based on their friendship, "I'd like to [d]o something nice for you and pay off your mortgage." In late August 2010, Scott mentioned to Robert that he might have found a way to have the mortgage paid off and

- 2 -

Robert understood that [Appellant] was somehow involved. The mortgage happened to be held by Wells Fargo, where [Appellant] had his accounts. Some time passed and then [Appellant] invited Scott to come to the Wells Fargo Kennett Square branch ("Bank") to see "what we can do."

On September 22, 2010, Scott traveled with [Appellant] to the Bank. [Appellant] was a frequent customer at this branch and was friendly with the branch manager, Triandos Randolph ("Bank Manager"). Scott was introduced to the Bank Manager and a meeting followed between Scott, [Appellant], and the Bank Manager. During the meeting, [Appellant] told Scott that if he wanted the mortgage paid, the Property would be transferred into [Appellant's] name. Scott thought the request was "kind of strange" and the meeting ended without a commitment from Scott, as he needed time to think about it.

Robert knew that on September 23, 2010, Scott and [Appellant] were going to the Bank to possibly take care of the mortgage and Robert thought this was fine. He understood that they would "go find out, and if so far – if something happens, that, you know, it could happen, well, then I would come down." Robert did not know or expect that the Property would be transferred to [Appellant] that day. Robert never went to the Bank on September 23rd or any day. Robert did not sign the deed or any papers to transfer the Property.

On September 23, 2010, Scott returned to the Bank with [Appellant]. In a meeting with [Appellant] and the Bank Manager, Scott was confronted with a $100,000[.00] balloon payment that was falling due. On hearing this, Scott was afraid of losing the Property. [Appellant] promised Scott that if the Property was transferred, he and Robert could live there the rest of their lives as long as they maintained the Property as they always had and paid the property taxes. Scott agreed to transfer the Property "[b]ecause they were pressuring me. They – I don't know. It was some kind [of] scam or con, they were conning me I guess, and I ended up believing them, I guess." In fact, there was no balloon payment. The only debt on the Property was the mortgage, in the original amount of $70,000[.00] that had been discussed the day before.

Robert recalls a telephone call that he received from [Appellant] that day, while [Appellant] was at the Bank, and, after speaking with [Appellant], Robert asked to speak with and then did speak

with Scott. Scott does not recall this [tele]phone call. [Appellant] denies that this [tele]phone call took place. [According to Appellant, Scott and Robert both attended the settlement.] Robert testified that [Appellant] called him and "was explaining about --- about the mortgage and how it had to be put in his name, and I didn't think it was a good idea and I expressed no to him in so many words. And then I said I want to talk to Scott, you know, and I trust my brother to make the right decisions." Robert then had a short conversation with Scott and told Scott that he did not think the transfer was a good idea. Robert also told Scott, "Do what you think is right." Robert never authorized Scott to transfer the Property or to sign his (Robert's) name to the deed or other documents.

\*          \*          \*

When Scott agreed to transfer the Property, he was given, while still in the Branch Manager's office, all of the papers needed to transfer title from the Brothers to [Appellant]. Scott signed both his name and Robert's name to all of the papers, including the deed. Scott testified [that he provided Robert's signature and his own signature and a notary public notarized both signatures.] Scott also affirmed at trial that he knew if the legitimacy of the documents was ever questioned, it would be apparent that Robert had not signed. Finally, despite the documentation that he signed, Scott retained the belief that [Appellant] was gifting him and his brother payment of the mortgage, helping out the family based on friendship, as [Appellant] had previously offered. Scott did not understand the documents he was signing.

To obtain the Property, [Appellant] paid Wells Fargo $62,751.37 to clear the mortgage and the transfer tax of $4,122.82. The Property was worth between $206,140[.00] and $358,000[.00].

Scott testified that he did not have permission or authority from Robert to sign the deed or other documents on his behalf. Scott testified that it was "through much duress. I was coached into doing this."

\*          \*          \*

Scott did not tell Robert what had occurred at the Bank because he thought Robert would not have agreed to transfer the Property. Robert testified at his deposition that Scott only told him that night that the mortgage had been paid, without any further detail. Robert could not recall the details about this conversation at trial.

The Brothers received correspondence and a check in the amount of $696.62 from Wells Fargo shortly after September 26, 2010. The letter referenced the paid in full mortgage. Scott testified that when the letter arrived, he told Robert that the mortgage had been paid, but he did not disclose the Property transfer. At this time, Robert understood only that the mortgage had been paid and he wondered how that had happened, but did not pursue the issue. Robert did not know if a gift or private loan had been made by [Appellant]. The check from Wells Fargo referenced a "sale," but Robert did not question the meaning.

When Robert received a tax bill in January 2011 for Property, he observed that the bill was in [Appellant's] name and confronted Scott; Robert was furious. Scott finally explained that he had transferred the Property, but tried to soften the impact by further explaining that [Appellant] had promised that the Brothers only needed to maintain the Property and pay the taxes and they could live there the rest of their lives. Neither Brother thought it would be possible to reverse the transaction at that time. Robert was concerned about losing the house that he had renovated to care for his handicapped family. The Brothers knew [Appellant] was wealthy and did not believe they had the resources to fight him.

After receiving the tax bill, Robert also confronted [Appellant] about the transfer of the Property. [Appellant] responded by saying there had been two mortgages against the Property and he had paid $220,000[.00] to clear the debt. This was a fabrication. [Appellant] reassured Robert that things would be all right and that he just needed to pay the taxes. Robert trusted [Appellant] and believed what he was told.

From 2010 through trial, Robert paid the taxes at the Property, either directly to the taxing authorities or by reimbursing [Appellant]. When questioned at trial, [Appellant] agreed that the taxes were up to date.

[Appellant] first demanded rent from the Brothers in the summer of 2014 after [Appellant] and his girlfriend/attorney, Mickala Rector, came to the Property to evict the Brothers and their family. The rent demand was for more than $50,000[.00] for the past four years. As a result of the threatened eviction and rent demand, the Brothers finally consulted an attorney.

On December 17, 2014, Brothers filed a complaint to quiet title raising two counts[. Brothers first asserted fraud by Appellant against Robert, that Robert's signature on the deed was a forgery,

- 5 -

and, thus, the deed was void *ab initio*. The second count of the complaint asserted breach of contract and fraud by Appellant against the Brothers.]

[Appellant] answered the complaint on February 18, 2015 and filed amended new matter and counterclaim, with permission, on February 2, 2016. The amended counterclaim raised five counts, the first to quiet title against Scott, the second for specific performance against Brothers, the third for unjust enrichment against Brothers, the fourth for fraud against Scott and the fifth for breach of warranty of title to real estate against Brothers. Brothers replied to the amended new matter, answered the amended counterclaim and pled new matter on March 10, 2016. Pleadings closed on March 21, 2016 with [Appellant's] reply to new matter.

The matter was called to trial on January 22, 2018 and a decision issued April 26, 2018 in favor of Robert against [Appellant] on the complaint and in favor of [Appellant] against Scott on the counterclaim. The decision [made Robert and Appellant joint tenants in common of] the Property. Post-trial motions were timely filed by [Appellant] and denied. [Appellant] then timely filed the pending appeal.

Trial Court Opinion, 1/28/2019, at 1-8 (record citations and footnotes omitted).

On appeal, Appellant presents the following issues for our review:

I. Whether the trial court erred as a matter of law in finding the deed was forged and canceled as to Robert C. Watkins, because Appellee[, Robert C. Watkins] did not establish by clear and convincing evidence that the signature on the deed [], even if signed by Scott Watkins, was an unauthorized signing[?]

II. Whether the trial court erred as a matter of law because its analysis of the authority and agency issue misapplies the testimony exception of the statute of frauds and incorrectly requires Appellant to accept[,] as true, Appellee[, Robert C. Watkins'] testimony?

III.  Whether the trial court erred as a matter of law where its opinion finds every inference for Appellee[, Robert C. Watkins] and against Appellant [that Appellee, Robert C. Watkins met his] standard of proof [of presenting] clear and convincing evidence?

IV.  Whether the trial court erred as a matter of law and abused its discretion when it found Appellant made an oral promise to Scott Watkins and/or Appellee[, Robert C. Watkins] that he/they could live on the property, rent free, for the rest of his/their lives because the quiet title complaint concedes any such oral promise would not be enforceable under the statute of frauds and/or there is no sufficient evidence to support this finding and/or the quiet title action was bifurcated from the eviction and rental action by order dated January 19, 2018?

V.  Whether the trial court erred as a matter of law when it created a tenancy-in-common between Appellant and Appellee[, Robert C. Watkins,] by its decision dated April 26, 2018, and denied Appellant's request for a new hearing to determine the fair market rental value for the property?

Appellant's Brief at 12-13 (superfluous capitalization, quotations, and suggested answers omitted).[1]

Appellant's first two issues are inter-related.  Appellant generally challenges the trial court's decision that Robert C. Watkins' signature on the

_____

[1]  Initially, we note Appellant's Pa.R.A.P. 1925(b) concise statement, statement of questions presented pursuant to Pa.R.A.P. 2116, and the individual argument sections in his appellate brief under 2119(a) lack parity. Appellant abandoned an issue pertaining to a notary by failing to brief that issue on appeal and we deem it waived. **Commonwealth v. Dunphy**, 20 A.3d 1215, 1218 (Pa. Super. 2011) (issues raised in Pa.R.A.P. 1925 concise statement that are not developed in appellate brief are abandoned); **see also Commonwealth v. Woodward**, 129 A.3d 480, 509 (Pa. 2015) (holding that "where an appellate brief fails to … develop an issue in any [] meaningful fashion capable of review, that claim is waived[]").  To the extent that Appellant's issues overlap, for clarity and ease of discussion, we will address them together.

deed at issue was forged and signed without his authority. More specifically, Appellant argues that Robert "did not establish a forgery or fraud claim because he did not show [an unauthorized signing] by clear and convincing evidence[.]" *Id.* at 24 (original emphasis omitted). Appellant points to Robert's deposition testimony wherein he stated that he told his brother, Scott, to do what he thought was right in connection with the subject transaction. *Id.* at 21. As such, Appellant contends that Robert gave Scott the express, implied, or apparent authority, as his agent, to the sign the deed on his behalf. *Id.* at 32-46. Appellant maintains that "the familial relationship and the brothers' extreme reliance upon each other and trust in one another, with which Appellant was historically familiar, combined with the other attendant circumstances, led Appellant to reasonably believe that [Robert] gave Scott Watkins the authority to transfer the property to Appellant in consideration for Appellant paying the mortgage, in full, and permitting the brothers to rent the Property for a reduced rate." *Id.* at 41-42. Moreover, Appellant argues that, "even after learning the Property was transferred to Appellant, [Robert] silently retained the financial benefits of the paid-off mortgage." *Id.* at 46.

We have reviewed the parties' briefs, the applicable law, the certified record, and the trial court's opinion. We conclude that the trial court's January 28, 2019 opinion accurately addresses Appellant's first two assertions of error. The trial court examined whether Scott had express, implied, or apparent agency to act on Robert's behalf in transferring the Property and concluded

- 8 -

that there was no evidence that "could have caused [Appellant] to believe that Scott had authority to transfer the Property." Trial Court Opinion, 1/28/2019, at 11. We affirm the trial court's order based on the reasoning set forth in its opinion, and direct that a copy of that opinion be filed along with this memorandum in all future appellate filings.

In issue three as presented in his appellate brief, Appellant claims that the trial court erred by accepting Scott's testimony that he forged Robert's signature to the closing documents. Appellant's Brief at 22. Appellant claims, pursuant to the "testimony exception" to the statute of frauds applicable in real-estate actions, the trial court was precluded from considering the Brothers' oral testimony where the deed was already an enforceable writing. *Id.* at 47-48. He argues that the "testimonial exception" allows the trial court to use the Brothers' testimony regarding forgery against the Brothers "without accepting it as true[.]" *Id.* at 48. According to Appellant, the trial court improperly shifted the standard of proof and burden of persuasion to him. *Id.* at 46.

Appellant's fourth issue is, to some extent, related to his third claim. Again, relying upon the statute of frauds, Appellant argues that the trial court "erred in finding that there was an oral promise to [the Brothers] that they could live on the Property, rent-free for the rest of their lives."[2] Appellant's Brief at 50. Appellant contends that the trial court "abused its discretion when

---

[2]    As will be discussed below, issues pertaining to fair market rental are currently pending in a separate action before the trial court.

- 9 -

it found Scott's unsubstantiated testimony sufficiently credible" when Scott "impeached himself as he testified to the commission of a crime." *Id.* at 51.

The trial court determined that Appellant's promises to Scott and Robert "[did] not implicate the parol evidence rule or statute of frauds" because "the terms of the transfer of the Property [were] integral to the factual findings in this matter" and the fact that "neither Scott nor Robert can enforce [Appellant's] promise for a life estate for lack of writing [was] irrelevant." Trial Court Opinion, 1/28/2019, at 15.

We agree with the trial court's assessment. Here, the trial court was confronted with vastly different versions of events. Appellant claimed that Robert was present at the bank and signed the documents at issue for the property transfer. Whereas, the Brothers claimed that only Scott was present and that he supplied Robert's signature to the relevant documents upon undue pressure from Appellant. Thus, the Brothers maintained that Appellant procured the deed by fraud and sought to invalidate it. Accordingly, the core issue to be decided was whether the deed was valid or fraudulently induced. As such, Appellant's argument that the trial court was bound by the terms of the written deed and could not hear testimony regarding Appellant's oral promises rings hollow.

The statute of frauds directs that agreements for the sale of real estate shall not be enforced unless they are in writing and **signed by the seller**. *See* 33 P.S. § 1 (emphasis added). This Court previously determined:

The statute of frauds directs that agreements for the sale of real estate shall not be enforced unless they are in writing **and signed by the seller**. The purpose of the statute is to prevent perjury and fraudulent claims. The [s]tatute of [f]rauds does not void those oral contracts relating to land which fail to comply with the [s]tatute's formal requirements. It is to be used as a shield and not as a sword, as it was designed to prevent frauds, not to encourage them.

*Empire Properties, Inc. v. Equireal, Inc.*, 674 A.2d 297, 302 (Pa. Super. 1996) (internal citations and quotations omitted) (emphasis added).

Additionally, our Supreme Court has held:

Where the parties, **without any fraud** or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437 (Pa. 2004) (citation omitted) (emphasis added).

Moreover, the *Yocca* Court stated:

Notably, while parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, *i.e.*, that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract.

*Id.* at n.26.

Based upon all of the foregoing, we conclude that the trial court did not err by considering oral testimony regarding whether the document at issue

complied with the statute of frauds. Scott has maintained that he did not authorize or otherwise sign the deed at issue. To accept Appellant's suggestion that the written deed controls would be akin to allowing Appellant to use that document as a sword against Scott. Further, because the Brothers claimed that the deed was executed fraudulently, the trial court was permitted to hear oral testimony regarding its formation. Tasked with a classic credibility determination, here, the trial court ultimately deemed the Brothers more credible and we will not usurp that determination.[3]

In his fifth issue on appeal, Appellant asserts that the trial court erred "when it refused to grant a new trial as to the fair market rental value of the Property because Appellant is entitled to receive fifty percent (50%) of said value." Appellant's Brief at 54. However, as Appellant concedes, there is a

---

[3] We adhere to the following standard:

> Appellate review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Corvin v. Tihansky*, 184 A.3d 986, 992 (Pa. Super. 2018) (original brackets and citation omitted).

separate action for rent and trespass pending before the trial court. *Id.* As the trial court aptly noted:

> [Appellant] did not request rent in his first counterclaim. None of the counterclaims requested rent. No rental evidence was offered at trial. [Appellant] raised no timely claim for rent and provided no evidentiary basis on which to award rent.
>
> *                *                *
>
> This was not a partition action, but rather an action to quiet title. [Appellant] has a claim for rental value pending in a separate action commenced one week after the within action.

Trial Court Opinion, 1/28/2019, at 12. As such, claims pertaining to an alleged life estate and fair market rental value regarding the subject property are not properly before us and we decline to address those issues.

Finally, we note that, on October 30, 2019, Appellant filed a motion for leave to file a supplemental brief with this Court. By *per curiam* order, this Court granted Appellant leave to file a supplemental brief. We deemed the supplemental brief filed as of October 30, 2019. In the supplemental brief, Appellant raises an additional issue and urges this Court to remand this matter to the trial court for a new hearing to consider evidence that Appellant discovered after trial purporting to show that the Brothers concealed material evidence that "substantially contradicts the underlying foundation of the trial [c]ourt's decision[.]" Appellant's Supplemental Brief at 6. Appellant claims that, after trial, he discovered documents that dispute the trial court's finding that the Brothers are "unsophisticated, trusting men who would prefer to look the other way when confronted with trouble." *Id.* at 22, *citing* Trial Court

Opinion, 1/28/2019, at 2. More specifically, he contends that "[f]ollowing the trial, Appellant [] discovered documents which evidence that the Watkins Brothers are sons of a regionally renowned real estate mogul named Samuel G. Watkins ("Sam Watkins") and grew up in an affluent, sophisticated and financially literate family that was deeply involved on a daily basis with real estate acquisitions, developments, construction and property sales." *Id.* Appellant claims that these documents reveal that the Brothers were well travelled and educated and that their father owned 10 real estate companies. *Id.* at 22-26. Further, Appellant maintains that after the Brothers vacated the subject premises, a cleaning crew found a newspaper article from 1969 about Robert making financial investments as a child, as well as, two unrecorded real estate contracts on a "burn pile" near the fireplace. *Id.* at 26-32. Appellant argues that if the trial court had all of this information prior to trial it would not have reached its conclusion that the Brothers were unsophisticated with regard to real estate transactions. *Id.* at 39.

> We previously determined:
>
> To secure a new trial on the ground of after-discovered evidence or discovery that false testimony was given, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result.

*Ebner v. Ewiak*, 484 A.2d 180, 184–185 (Pa. Super. 1984) (citations and quotations omitted).

- 14 -

While Appellant characterizes the evidence he allegedly uncovered as material, in actuality, the proffered evidence could only be used to impeach the Brothers' testimony. As discussed at length above, the material issue in the quiet title action was whether Robert personally signed the deed transferring the Property or gave Scott authority as his agent to do so. None of the alleged after-discovered evidence would have materially aided the trial court in coming to its ultimate decision. As such, we deny Appellant relief on the issue presented in his supplemental brief to this Court.

Judgment affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/31/20

ROBERT C. WATKINS  : IN THE COURT OF COMMON PLEAS
and SCOTT R. WATKINS
           Plaintiffs  : CHESTER COUNTY, PENNSYLVANIA

       v.  : NO. 2014-09170-RC

JOSEPH RIAD  : CIVIL ACTION
          Defendant

## OPINION PURSUANT TO PA. R.A.P. 1925

This quiet title action was heard over three days without a jury beginning January 22, 2018. A decision was entered April 26, 2018 granting one half-interest in the subject property to Plaintiff, Robert C. Watkins, and one half-interest to Defendant, Joseph Riad ("Riad"). Riad's motion for post-trial relief was denied on October 26, 2018 and Riad timely filed an appeal. Riad subsequently filed a statement of matters complained of on appeal, which we address after setting forth the factual background of this case.

*Factual Background*:

This case involves the transfer of ownership of Plaintiffs' residential farm property. The circumstances surrounding the transfer are disputed by Plaintiffs, who are brothers, Robert and Scott Watkins (individually "Robert" or "Scott", and together "Brothers") and Riad. After considering all of the evidence and observing the parties and their witnesses during trial, we found the Brothers and their witnesses credible and concluded that the Brothers had proven their factual case. In contrast, we concluded that Riad and his witnesses were not credible.

At all relevant times, the Brothers have resided at 223 Greenhouse Road, East Nottingham Township, Chester County, Pennsylvania (the "Property").[1] Brothers resided at the Property for more than thirty years and received title from their mother, Ilsa Watkins, on February 17, 1982. (Vol. 1, 28:20-25, Exh. D-1)[2] In September 1997, Brothers encumbered the Property with a 30-year, $70,000 mortgage. (Vol. 1, 32:8-23, 92:5-11, 116:25-117:7, Exh. D-2)

---

[1] At the time of trial, Scott was dividing his time between the Property and the property of his new wife. (Vol. 1, 24:18-25)

[2] The transcript from January 22, 2018 is referenced as Vol. 1, from January 23, 2018 as Vol. 2, and from January 24, 2018 as Vol. 3.

Brothers and Riad have known each other for more than twenty years. Prior to the disagreements that led to this litigation, Scott and Riad were close enough to consider one another family. (Vol. 1, 26:25-27:2) Robert considered Riad to be an acquaintance. (Vol. 1, 91:18-20)

Brothers are unsophisticated, trusting men who would prefer to look the other way when confronted by trouble. Scott, 60 years old at trial, is a self-employed mechanic, primarily, if not exclusively, working on motorcycles, and a part-time nurseryman. (Vol. 1, 22:24, 24:1-4) Robert, 66 years old at trial, left employment in 1997 to care for his mother. (Vol. 1, 89:5, 89:23-24) Robert has a 1976 degree from Arizona State University and a degree from Del Tech Community College. (Vol. 1, 112:24-113:11) Robert raced Standardbred horses and worked as a stage crew hand at the Hotel DuPont Theater. (Vol. 1, 93:11-16)

Riad, 45 years old at trial, is an educated and sophisticated businessman. (Vol. 2, 33:23) Riad moved to the United States from Kuwait when he was 14 years old and became a citizen in 1998. (Vol. 2, 33:24-34:9) He matriculated at West Chester University at age 15 and graduated three years later with a degree in computer science and an accounting minor. (Vol. 2, 33:18-34:13) Riad has been a commodities trader at IMA World Trade and technical services director for an engineering firm, EPS. At the time of trial, Riad was chairman of Riad Trust & Holdings, a business that purchases and refines gold. (Vol. 2, 35:15-36:11, 108:25-109:12) In addition, at the time of trial, Riad had a farm and was engaged in the overseas exportation of cattle. (Vol. 2, 36:12-20)

Brothers at times have had difficulty financially making ends meet. (Vol. 1, 93:3-8, 117:8-118:11) After leaving employment in 1997, Robert cared for his mother, who was debilitated from dementia and lived at the Property, until she passed away in September 2017. (Vol. 1, 29:5-30:16, 89:17-20, 90:1-9) Robert also cares for his wife, Rebecca Beckenstrater ("Beckenstrater"), at the Property; she is debilitated from multiple sclerosis. (Vol. 1, 31:10-21, 32:2-7, 89:10-91:8) Beckenstrater has lived at the Property since April, 2010. (Vol. 1, 91:9-11) At the time of trial, Beckenstrater was confined to a wheelchair and partially blind.

2

Robert has modified the residence to accommodate the handicapped members of his family. (Vol. 1, 100:8-12)

Riad was aware of Brothers' financial difficulties and the burden Robert endured caring for family members. (Vol. 1, 30:21-31:4, 31:22-32, 48:6-9, 101:4-15) In August 2010, Riad approached Scott and began to work on him to convince him that he, Riad, could alleviate the family's financial burden. (N.T. Vol. 1, 33:20-24, 34:21-25) Riad told Scott that based on their friendship, "I'd like to so something nice for you and pay off your mortgage." (N.T. Vol. 1, 33:23-34:2) In late August 2010, Scott mentioned to Robert that he might have found a way to have the mortgage paid off and Robert understood that Riad was somehow involved. (Vol. 1, 95:2-18) The mortgage happened to be held by Wells Fargo[3], where Riad had his accounts. Some time passed and then Riad invited Scott to come to the Wells Fargo Kennett Square branch ("Bank") to see "what we can do." (N.T. Vol. 1, 35:2-4)

On September 22, 2010, Scott traveled with Riad to the Bank. Riad was a frequent customer at this branch and was friendly with the branch manager, Triandos Randolph[4] ("Bank Manager"). (Vol. 1, 83:20-84:5) Scott was introduced to the Bank Manager and a meeting followed between Scott, Riad and the Bank Manager. (N.T. Vol. 1, 35:4-14) During the meeting, Riad told Scott that if he wanted the mortgage paid, the Property would be transferred into Riad's name. (N.T. Vol. 1, 35:14-17, 35:22-36:2, 53:3-6) Scott thought the request was "kind of strange" and the meeting ended without a commitment from Scott, as he needed time to think about it. (N.T. Vol. 1, 35:18-20, 52:10-20, 53:7-14)

Robert knew that on September 23, 2010, Scott and Riad were going to the Bank to possibly take care of the mortgage and Robert thought this was fine. He understood that they would "go find out, and if so far - - if something happens that, you know, it could happen, well, then I would come down." (Vol. 1, 96:4-6, 97:2-9, 120:8-14, 121:19-25) Robert did not know or expect that the Property

---

[3] Wachovia is referenced at times in the transcript and appears on certain documents. Wells Fargo took over Wachovia.

[4] The Bank Manager now lives out of state and did not testify at trial. (Vol. 1, 36:10)

3

would be transferred to Riad that day. (Vol. 1, 97:2-4, 99:22-23) Robert never went to the Bank on September 23rd or any day. (Vol. 1, 96:7-12, 119:1-3) Robert did not sign the deed or any papers to transfer the Property. (Vol. 1, 118:19-25)

On September 23, 2010, Scott returned to the Bank with Riad. (Vol. 1, 42:22-25, 52:21-23, 53:15-18, 121:14-18) In a meeting with Riad and the Bank Manager, Scott was confronted by Riad with a $100,000 balloon payment that was falling due. (Vol. 1, 36:5-24, 37:6-8; 46:17-47:2) On hearing this, Scott was afraid of losing the Property. (Vol. 1, 36:21-37:2, 37:18-20) Riad promised Scott that if the Property was transferred, he and Robert could live there for the rest of their lives as long as they maintained the Property as they always had and paid the property taxes. (Vol. 1, 37:21-38:1) Scott agreed to transfer the Property "[b]ecause they were pressuring me. They - - I don't know. It was some kind of scam or con, they were conning me I guess, and I ended up believing them, I guess." (Vol. 1, 37:9-16) In fact, there was no balloon payment. The only debt on the Property was the mortgage, in the original amount of $70,000 that had been discussed the day before.

Robert recalls a telephone call that he received from Riad that day, while Riad was at the Bank, and, after speaking to Riad, Robert asked to speak with and then did speak with Scott. Scott does not recall this phone call. (Vol. 1, 54:22-25) Riad denies that this phone call took place.[5] Robert testified that Riad called him and "was explaining about - - about the mortgage and how it had to be put in his name, and I didn't think it was a good idea and I expressed no to him in so many words. And then I said I want to talk to Scott, you know, and I trust my brother to make right decisions." (Vol. 1, 96:16-23, 122:7-123:5, 124:22-125:2) Robert then had a short conversation with Scott and told Scott that he did not think the transfer was a good idea. (Vol. 1, 97:12-13, 123:6-17, 125:3-5, 125:3-5) Robert also told Scott, "Do what you think is right." (Vol. 1, 124:6-9, 124:15-17, 125:16-23) Robert never authorized Scott to transfer the Property or to sign his

---

[5] According to Riad, Scott and Robert both attended settlement. Therefore, there could not have been a phone call. (Vol. 2, 66:7-17)

4

(Robert's) name to the deed or other documents. (Vol. 1, 108:20-109:1, 124:5-17, 125:14-15, 126:2-3)

Whether at trial or during deposition[6], Robert's testimony concerning this phone call was consistent. He stated multiple times that he had a phone conversation with Riad and told Riad that he did not think it was a good idea to put the Property in Riad's name and told Riad no. He then asked to speak with Scott and Scott took the phone. Robert then told Scott that the transfer was not a good idea. He also told Scott to do what he thought was right. Robert understood that Scott was at the Bank with Riad exploring ways to handle the mortgage. Robert expected a gift or a new private mortgage. Neither would have required that the Property be placed in Riad's name and Robert understood that his presence would be necessary to transfer the Property. His words, do what you think is right, do not amount to authorization to transfer the Property.

When Scott agreed to transfer the Property, he was given, while still in the Branch Manager's office, all of the papers needed to transfer title from the Brothers to Riad. (Vol. 1, 41:19-24) Scott signed both his name and Robert's name to all of the papers, including the deed. (Vol. 1, 40:19-25, Exh. W-1) Scott testified:

> A. Yeah, well, the way that worked was they had me sign Bob's name against duress. I didn't really want to do that, but I figured I had to, so I signed Bob's name, and then they had a notary come in and then she witnessed me sign my name under Robert Watkins' signature that I signed.
>
> Q. So just so we're clear - -
>
> The Court: I want to ask a question. Did she notarize your signature as well as his?
>
> The Witness: Yes. But Robert's signature was already - - they already had me write his signature down before she came in to the room. Okay. And then she witnessed my signature, and then put the notary on it.

---

[6] Deposition transcripts were used at trial to refresh Robert's memory.

(Vol. 1, 38:14-39:1) Scott also affirmed at trial that he knew if the legitimacy of the documents was ever questioned, it would be apparent that Robert had not signed. (Vol. 1, 54:7-10) Finally, despite the documentation that he signed, Scott retained the belief that Riad was gifting him and his brother payment of the mortgage, helping out the family based on friendship, as Riad had initially offered. (Vol. 1, 58:12-21) Scott did not understand the documents he was signing. (Vol. 1, 67:4-9)

To obtain the Property, Riad paid Wells Fargo $62,751.37 to clear the mortgage and the transfer tax of $4,122.82. (Vol. 2, 107:8-10, Exh. D-4) The Property was worth between $206,140 and $358,000. (Vol. 2, 105:18-19, Exh. W-9; Trial Dep. of Joseph Summers, 11:17-15)

Scott testified that he did not have permission or authority from Robert to sign the deed or other documents on his behalf. (Vol. 1, 41:4-16) Scott testified that it was "through much duress. I was coached into doing this." (Vol. 1, 41:11-12)

When matters were concluded at the Bank, Scott and Riad left together and had lunch at a local restaurant. Eventually, Riad took Scott home. (Vol. 1, 42:7-25)

Scott did not tell Robert what had occurred at the Bank because he thought Robert would not have agreed to transfer the Property. (Vol. 1, 43:1-11, 52:24-53:2, 55:1-20) Robert testified at his deposition that Scott only told him that night that the mortgage had been paid, without any further detail. Robert could not recall any details about this conversation at trial. (Vol. 1, 126:23-129:11)

The Brothers received correspondence and a check in the amount of $696.62 from Wells Fargo shortly after September 26, 2010. (Exh. D-10) The letter referenced the paid in full mortgage. Scott testified that when the letter arrived, he told Robert that the mortgage had been paid, but he did not disclose the Property transfer. (Vol. 1, 58:8-11) At this time, Robert understood only that the mortgage had been paid and he wondered how that had happened, but did not pursue the issue. (Vol. 1, 97:19-98:2, 133:23-25) Robert did not know if a gift or private loan had been made by Riad. (Vol. 1, 119:11-120:1) The check

6

from Wells Fargo referenced a "sale", but Robert did not question the meaning. (Vol. 1, 134:1-134:7, Exh. D-9)

When Robert received a tax bill in January 2011 for the Property, he observed that the bill was in Riad's name and confronted Scott; Robert was furious. (Vol. 1, 43:12-18, 21-23, 98:3-16) Scott finally explained that he had transferred the Property, but tried to soften the impact by further explaining that Riad had promised that the Brothers only needed to maintain the Property and pay the taxes and they could live there the rest of their lives. (Vol. 1, 44:1-9) Neither Brother thought it would be possible to reverse the transaction at that time. (Vol. 1, 65:19-66:7, 98:22-24, 99:17-19, 120:23-121:2) Robert was concerned about losing the house that he had renovated to care for his handicapped family. (Vol. 1, 100:6-12) The Brothers knew Riad was wealthy and did not believe they had the resources to fight him.[7] (Vol. 1, 34:4-5; 121:1-2)

After receiving the tax bill, Robert also confronted Riad about the transfer of the Property. Riad responded by saying there had been two mortgages against the Property and he had paid $220,000 to clear the debt. (Vol. 1, 98:16-99:15) This was a fabrication. Riad reassured Robert that things would be all right and that he just needed to pay the taxes. (Vol. 1, 100:2-5) Robert trusted Riad and believed what he was told. (Vol. 1, 112:22-23)

From 2010 through trial, Robert paid the taxes at the Property, either directly to the taxing authorities or by reimbursing Riad. (Vol. 1, 101:16-102:24, 105:12-108:19, Exh. W-3) When questioned at trial, Riad agreed that the taxes were up to date. (Vol. 2, 127:5-8)

Riad first demanded rent from the Brothers in the summer of 2014 after Riad and his girlfriend/attorney, Mickala Rector, came to the Property to evict the Brothers and their family. (Vol. 1, 44:14-45:1, 64:10-65:9) The rent demand was for more than $50,000 for the past four years. (Vol. 1, 44:22-24) As a result of

---

[7] Prior to the start of trial a ruling had been entered precluding evidence of Riad's wealth. However, because Riad raised the issue himself on direct examination, the evidence was permitted. Riad testified that he was coming into millions and that the Brothers knew he was coming into money in 2010 when the events recited herein were unfolding. (Vol. 2, 46:5-7, 48:3-4, 109:13-111:4)

7

the threatened eviction and rent demand, the Brothers finally consulted an attorney. (Vol. 1, 45:1-8)

On December 17, 2014, Brothers filed a complaint to quiet title raising two counts, the first asserting that Robert's signature on the Deed is a forgery and thus the Deed is void ab initio as well as fraud by Riad against Robert, and the second asserting fraud by Riad against Brothers and breach of contract.

Riad answered the complaint on February 18, 2015 and filed amended new matter and counterclaim, with permission, on February 2, 2016. The amended counterclaim raised five counts, the first to quiet title against Scott, the second for specific performance against Brothers, the third for unjust enrichment against Brothers, the fourth for fraud against Scott and the fifth for breach of warranty of title to real estate against Brothers. Brothers replied to the amended new matter, answered the amended counterclaim and pled new matter on March 10, 2016. Pleadings closed on March 21, 2016 with Riad's reply to new matter.

The matter was called to trial on January 22, 2018 and a decision issued April 26, 2018 in favor of Robert and against Riad on the complaint and in favor of Riad and against Scott on the counterclaim. The decision gave Robert and Riad fifty-percent ownership each of the Property. Post-trial motions were timely filed by Riad and denied. Riad then timely filed the pending appeal.

*Issues preserved on appeal:*

Riad filed a statement of matters complained of on appeal raising issues in five paragraphs. The issues are addressed seriatim.

1. Did the court err when it found a.) that the signature on the deed in Robert's name was an unauthorized forgery, b.) that Riad participated in the fraud perpetrated on Robert, c.) that the deed is illegal and void as to Robert, his signature thereto being a forgery, and d.) that the deed must be cancelled as to Robert and marked so as of record because proper application of Pennsylvania law to the undisputed evidence established a.) that with Robert's express and/or implied and/or apparent authority Scott signed Robert's name to the deed, making the signature authorized and not an unauthorized forgery or fraud, and/or b.) that Robert chose to silently retain the benefits conferred by Riad instead of seeking to remedy the conveyance of the Property, thereby ratifying Scott's conduct and otherwise being barred by the statute of limitations, doctrine of laches, estoppel and waiver.

8

To address Riad's argument, it is necessary to consider the case that Riad tried as compared to case that Riad has advocated post-trial. The evidence Riad proffered at trial was intended to show a.) that Scott and Robert fully participated in the decision to sell the Property (N.T. Vol. 2 45:13-47:23, 48:9-50:12, 52:18-58:14, 61:21-62:22, 64:5-21); b.) that Scott and Robert attended settlement on September 23, 2010 at the Wells Fargo branch office (N.T. Vol. 2 66:7-67:1, 71:2-11), and c.) that the deed and other documents transferring the Property were signed by Scott and Robert. (N.T. Vol. 2 67:5-71:18).

Post-trial, Riad has abandoned the factual case he tried to prove and has relied instead on certain facts we found to make a claim of agency. The factual case Riad tried to prove and the facts we found are in opposition. As discussed, the Brothers put on credible evidence a.) that Robert did not agree to sell the Property, b.) that only Scott appeared at the Bank on September 23, 2010, and c.) that a phone conversation between Scott and Robert took place and thereafter Scott signed Robert's name to the deed and other documents transferring the Property.

Riad contends that under an agency theory, based on the phone conversation between Scott and Robert, he should have prevailed. In other words, Riad contends he is entitled to rely on Robert's statement to Scott to "do what you think is best" made during a phone call that according to Riad never took place. Riad's position is absurd. He has plucked one factual finding from the case and attempted to twist it to his favor.

The last thing that Robert said to Riad during that phone call, before asking to speak to his brother, was no, he did not want to transfer the Property.

There is no evidence that Scott disclosed the content of his phone conversation with Robert to anyone. There is no evidence that Riad overheard Scott's side of the conversation. Riad could not have known that Scott was told to do what you think is best.

There is no evidence of any conversation as Scott began to sign Robert's name to documents. Are we to believe that Scott began signing Robert's name to documents and no one asked why? Scott did not sign Robert's name and then

9

add 'as agent for'. Scott testified that he knew he did not have Robert's authority to transfer the Property, but he did so anyway because he felt duress and pressure.

Robert, the only person with a recollection of the phone call, testified that he did not give authority to transfer the Property. In fact, during the phone call, he separately told Riad and Scott that he did not agree to the transfer. Robert understood that the September 23rd meeting was to investigate how the mortgage could be handled and believed that Riad was contemplating making a gift or a private loan. Neither required transfer of the Property. Robert understood that transfer of the Property would require his presence. His words, do what you think is best, did not include transferring the Property. Robert knew what he meant and Scott testified that he had no authority to sign Robert's name.

The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. Bradney v. Sakelson, 325 Pa.Super. 519, 523, 473 A.2d 189, 191 (1984)(citing Restatement (Second) of Agency, § 1, Comment b (1958)). Four types of agency have been identified and Riad contends that under each he prevails.

> An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel.

Walton v. Johnson, 2013 PA Super 108, 66 A.3d 782, 786 (Pa. Super. Ct. 2013).

"Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." Id. Robert never granted authority to Scott to act on his behalf in the transfer of the Property.

"Implied authority exists in situations where the agent's actions are 'proper, usual and necessary' to carry out express agency." Id. There was no express agency.

"Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has

10

granted the agent authority to act." Id. Robert's last words to Riad before Scott signed the deed and related papers were no, he did not agree to transfer the Property. There is no evidence that anything occurred between the utterance of those words and Scott's signing the deed and related papers that could have caused Riad to believe that Robert had given Scott authority to transfer the Property.

"Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal." Id. Robert told Riad that he did not agree to transfer the Property. Again, there is no evidence that anything occurred that could have caused Riad to believe that Scott had authority to transfer the Property.

Riad also contends that Robert chose to silently retain the benefits conferred by Riad, instead of undoing the conveyance of the Property, thereby ratifying Scott's conduct and otherwise being barred from quieting title by the statute of limitations, doctrine of laches, estoppel and waiver. In his post-trial motion, Riad raised these claims; however, he failed to develop any support for them in his post-trial brief stating only Robert "should be estopped from claiming the Deed was void because of his failure to take reasonable, timely steps to disavow his allegedly unauthorized signature on the Deed upon its discovery." (PTM Brief, p. 5) Issues are waived where there is no discussion, argument or citation to authority to support them. Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008). These claims have been waived. Nonetheless, we note that Robert, upon learning that the Property had been transferred in January 2011, did confront Riad. Riad responded by saying there had been two mortgages against the Property and he had paid $220,000 to clear the debt, which was a fabrication. In this conversation, Riad reassured Robert that things would be all right and that he just needed to pay the taxes. Robert trusted Riad and believed what he was told and took no action. Robert also believed that he did not have the resources to fight Riad.

11

Riad never addresses our legal conclusion, based on our factual findings, that the transfer of the Property as to Robert was void ab initio. A forged deed conveys no title. A forged deed is not voidable, but is void. Reck v. Clapp, 98 Pa. 581 (1881). Even as to one who is innocent, and Riad was not innocent, a forged deed cannot pass title. Id. "No man can be deprived of his property by a forged deed or mortgage, no matter what may be the bona fides of the party who claims under it." Smith v. Markland, 223 Pa. 605, 72 A. 1047 (1909). "[A] deed may be good in part and void in part. It may be good against one person and void against another." Id., 98 at 586. Robert's signature on the deed is a forgery. As to Robert, the deed is void.

2. Did the court err when it denied Riad's post-trial request to modify the Decision or grant a new trial to determine the market rental value of the Property and the property taxes after 2014?

Riad contends that we erred by making no award for rental value, since he was found to be the out-of-possession owner of fifty-percent of the Property. Riad raised five counterclaims in this action. The first counterclaim requested that Riad receive a fifty-percent interest in the Property, if we concluded that Robert did not sign the deed. This is the determination and award made. Riad did not request rent in his first counterclaim. None of the counterclaims requested rent. No rental value evidence was offered at trial. Riad raised no timely claim for rent and provided no evidentiary basis on which to award rent. Refusal to open the record post-trial to take evidence on a claim that was never raised is not error. The statute referenced by Riad, 68 P.S. § 101, is inapposite. This was not a partition action, but rather an action to quiet title. Finally, Riad has a claim for rental value pending in a separate action commenced one week after the within action.[8]

Riad also contends that we erred in finding that the Brothers paid all property taxes from the time of the transfer through the time of trial. The Brothers

[8] The two actions had been consolidated, but counsel were notified before the start of trial that the consolidation would be dissolved and only the quiet title action tried. The second action was not ready to be tried inasmuch as one of the defendants, Ilsa Watkins, was deceased and her estate had not been substituted.

12

provided an evidentiary basis for this finding that we determined to be credible. When questioned, Riad conceded that the taxes were current at time of trial.

3. Did the court err when it concluded that "[b]eing culpable toward Robert, Riad is not entitled by way of equitable lien or otherwise to reimbursement from Robert of the sum paid to clear the mortgage on the Property" [COL, ¶4] because the undisputed evidence at trial clearly showed that Riad conferred a financial benefit on Robert and Robert chose and for years continued to choose to silently appreciate that financial benefit for his and his family's pecuniary gain and as such has caused inequitable and substantial financial loss to Riad.

Riad maintains that the undisputed evidence at trial showed that Riad conferred a financial benefit on Robert and Robert knowingly accepted this benefit causing inequitable and substantial financial loss to Riad. In other words, our ruling unjustly enriched Robert at Riad's expense.

Riad points out in his post-trial motion brief that unjust enrichment is an equitable doctrine. (Brief, p. 12) Unjust enrichment occurs when a party either "wrongfully secured or passively received a benefit that would be unconscionable for her to retain." Torchia ex rel. Torchia v. Torchia, 499 A.2d 581, 581 (Pa. Super. 1973)(citation omitted). A party may recover where (1) another party is enriched and (2) an injustice will result if recovery is denied. Id. pp. 582-583.

When the Property was transferred, Robert held a one-half interest. The Property had a value of at least $206,000 and as much as $358,000. The debt against the Property was $62,751. Following the transfer, Robert continues to hold a one-half interest and there is no debt against the Property because Riad paid the mortgage.

Riad attempted to obtain a $206,000-$358,000 property for the payment of $62,751. To do so, he lied about the debt against the Property and made a promise that he did not keep about retaining a life estate for payment of taxes. Instead of the windfall he hoped for, Riad obtained a one-half interest in the Property, so an interest valued at minimally $103,000, for $62,751. Riad schemed, influenced and pressured Scott to cause Scott to sign over the Property. Riad initiated the fraud, caused all the papers to be prepared for the transfer and accepted Scott's signing of Robert's name. When Robert learned

13

that the Property had been titled to Riad, Robert confronted Riad and Riad lied to him about the conditions on the transfer. Robert and Scott believed that they could not fight Riad and took no action until Riad squeezed them harder, looking to collect rent and threatening an eviction. He who comes into a court of equity must come with clean hands. Riad seeks an equitable remedy, but stands before the court with unclean hands as to the controversy at issue. In re Estate of Pedrick, 505 Pa. 530, 482 A.2d 215, 222 (1984)("the doors of a court of equity [are closed] to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"). Riad is entitled to no equitable relief in this matter.

Additionally, it is difficult to understand what benefits Riad contends he conferred on Robert. A property worth $206,000-$358,000 was taken by clearing a debt of $62,751. The promise of a lifetime estate was never secured by a writing. The Brothers paid the property taxes before and after the transfer. Following transfer, the Brothers no longer had a mortgage payment, but instead, had an obligation to provide unspecified maintenance services for Riad. When Riad determined the Brothers were not performing, he demanded $50,000 for four years of back rent. The Brothers would have owed less money over four years if they had paid the mortgage, which carried a monthly payment of $627, instead of the $1,180 monthly rental that Riad demanded. (Vol. 1, 92:12-14; Vol. 2, 55:19-21)

4. Did the court err, to the extent its decision was premised on a presumption that a notary, Tina J. Magana, was not present and/or did not sign and affix her notary seal to the deed and other closing documents?[9]

Riad failed to raise this issue in his post-trial motion. This is a claim that the verdict is against the weight of the evidence. Such a claim is waived unless made as part of a post-trial motion. Bensinger v. Univ. of Pittsburgh Med. Ctr., 2014 PA Super 174, 98 A.3d 672, 685 (Pa. Super. Ct. 2014). Riad did not suggest any error concerning the notary in his post-trial motion or supporting brief. However, no factual finding was made with regard to the notary because

---

[9] Given our disposition of this claimed error, we have omitted from our recitation the evidence Riad claims was undisputed.

14

whether or not she affixed her signature to the deed and other disputed documents is irrelevant to the outcome of this case.

5. Did the court err in its factual findings that (a) "Riad convinced Scott that a balloon mortgage would soon fall due", (b) "Riad also promised Scott that he would permit Brothers to reside at the Property rent free for the remainder of their lives", and (c) "Robert was told that in exchange for the transfer of the Property and continued payment of property taxes, Riad had paid the mortgage and had given Brothers a life estate" [Findings of Fact, 17, 18 and 27] as these findings are against the weight of the evidence and clearly erroneous as a matter of law as oral statements concerning a purported transfer of real estate should neither have been considered by the court nor memorialized in the Decision because the statements are unsubstantiated oral statements by an interested party [Scott] that lack credibility and otherwise violate the rules on parole evidence and statue of frauds concerning the conveyance of real estate interests. The oral statements purportedly made are also legal conclusions and not statements of fact as they interpret the terms of a mortgage and note and cannot, as a matter of law, constitute a false or fraudulent statement of fact and/or concern a present existing intent and cannot, as a matter of law, constituted a false or fraudulent statement.

Riad's statements to the Brothers about the terms of the mortgage he paid do not implicate the parol evidence rules or statute of frauds.

Riad's promises to the Brothers about the terms of transfer of the Property are integral to the factual findings in this matter. That neither Scott nor Robert can enforce Riad's promise for a life estate for lack of a writing is irrelevant.

Riad maintains that he had less experience than either of the Brothers in matters involving real estate or mortgages. To the contrary, Riad is a sophisticated businessman with real estate holdings. On direct examination, Riad testified that he had not previously purchased any property prior to purchasing the subject property. (Vol. 2, 36:21-25) On cross-examination, Riad conceded that he owns three properties in Chester County in addition to the subject property. (Vol. 2, 111:5-24, 128:14-129:6) Riad also owns a property in Hockessin, Delaware. (Vol. 3, 12:20-13:11) Riad testified that he carefully researched the value of the Property before moving forward with his acquisition. (Vol. 2, 51:4-19, 52:9-17) Riad testified that he investigated the debt against the Property to insure that he had good title. (Vol. 2, 55:4-7, 59:16-23) In contrast, the real estate closing at issue is the first Scott ever attended. Scott did not

15

understand the HUD-1 that he signed. (Vol. 1, 67:4-17) There is no evidence that Robert had any experience in real estate.

Riad maintains that he did not have access to the mortgage and note that the Brothers held. To the contrary, Riad testified that he obtained the "paperwork that showed the loan" from Robert, brought it to the Bank and had the Bank Manager look up the loan and make copies. (Vol. 2, 61:5-62:1, 63:9-13)

Riad maintains that the Bank Manager confirmed the terms of the mortgage Scott. The record is devoid of evidence of what the Bank Manager might have said on either day that Scott was at the Bank. We are mystified by Riad's argument since Riad's counsel objected at trial to testimony concerning what the Bank Manager said and the objection was sustained. (Vol. 1, 36:14-20)

For all of the reasons stated, we entered our decision and order denying Riad's post-trial motion. This was a scheme concocted by Riad to separate the Brothers from their residential farm. The statute of limitations on any claim Scott could have pursued against Riad expired long before the action was brought. As to Robert, he did not sign the deed. The deed was void ab initio. Robert retains his one-half share of the Property.

BY THE COURT:

DATE: January 2ʰ, 2019

_____
Edward Griffith, J.

16